2020 IL App (1st) 172806-U
No. 1-17-2806

SECOND DIVISION
December 22, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 15 CR 0488201 |
| | ) | |
| ABE NASSAR, | ) | |
| | ) | The Honorable |
| Defendant-Appellant. | ) | Colleen Hyland, |
| | ) | Judge Presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Lavin and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held:* The judgment of the circuit court is affirmed, where (1) the State proved sufficient evidence to prove defendant guilty of aggravated criminal sexual assault and home invasion beyond a reasonable doubt; (2) the trial court properly permitted testimony regarding prior statements made by the claimant regarding the sexual assault; (3) the defendant was properly cross-examined regarding prior convictions that he attempted to downplay in direct examination; (4) the defendant did not clearly or sufficiently assert an ineffective assistance of trial counsel claim before the trial court and so the trial court was not required to inquire further or conduct a *Krankel* hearing; and (5) the defendant's sentence, which was in the lower portion of his sentencing range, was not excessive given the defendant's extensive criminal background and the particularly violent and harmful nature of the defendant's offenses.

¶ 2     Following a bench trial, defendant Abe Nassar was convicted of two counts of aggravated criminal sexual assault (ACSA) and one count of home invasion. He received three consecutive sentences, which included two 18-year prison sentences for the two ACSA convictions and one 8-year prison sentence for the home invasion conviction, totaling 44 years in prison.

¶ 3     On appeal, defendant argues that (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the trial court improperly permitted the admission of multiple prior consistent statements made by the victim; (3) the trail court failed to inquire into defendant's decision to receive a bench trial, even though defendant told the court his trial counsel forced him to waive a jury trial; (4) the State improperly impeached defendant regarding his criminal background; (5) the court improperly permitted evidence regarding a statement allegedly made by defendant that was not disclosed until the end of trial; and (6) defendant's sentence was excessive. We affirm.

¶ 4         I. BACKGROUND

¶ 5     Defendant was charged by indictment with two counts of ACSA (720 ILCS 5/11-1.30(a)(1) (West 2014)) and two counts of home invasion (*Id.* § 19-6(a)(1), (6) (West 2014)), following an incident in Bridgeview on February 25, 2015.

¶ 6     Prior to trial, defendant's trial counsel informed the circuit court that defendant was waiving a jury trial and tendered a jury waiver signed by defendant. The court asked defendant whether the signature on the waiver was his, and defendant stated, "Yes, ma'am." Defendant also confirmed he understood that he was giving up his right to be tried before 12 people selected by the parties' attorneys, and that a jury would need to reach a unanimous decision regarding his guilt. Additionally, defendant confirmed he understood that upon waiving a jury trial, the circuit court would make the decision regarding his guilt.

¶ 7      At trial, the State called W.M., who testified that she was born in Jordan and married defendant in 2005. In 2006, she moved to the United States from Jordan. W.M. had three children with defendant, she went back to Jordan in 2012 to divorce defendant, and subsequently returned to the United States to live in Illinois. Her children, who had lived in Florida with defendant for a short time, eventually returned to Illinois with W.M., while defendant remained in Florida. W.M. testified that she was currently in a marriage with Baha Sara.

¶ 8      In the afternoon of September 3, 2013, W.M. and her sister sat outside W.M.'s workplace in a vehicle with the window open. lived in Florida with defendant for a short time lived in Florida with defendant for a short time Defendant approached in a vehicle containing W.M.'s children. He exited the vehicle and punched the left side of W.M.'s face, causing a bruise. Defendant then drove away and left the children outside crying. Following this incident, W.M. received an order of protection against defendant, who still lived in Florida. Defendant called and visited their children, but W.M. had no relationship with him.

¶ 9      On the evening of May 31, 2014, W.M.'s husband Sara was traveling out of state. Defendant called W.M. and stated that she should try a restaurant on the north side of Chicago, and that he had already made a reservation for her. At about 11:30 p.m., W.M. and her girlfriend Iman Abdelnabi went to the restaurant and were seated at a table that was "from Abe." Eventually, defendant entered, sat at the bar, and then followed Abdelnabi outside. Defendant returned soon after and forced W.M. to dance with him for a few minutes. W.M. could feel a knife-like object jabbing her side, but she did not scream because she was afraid. Next, defendant took W.M. to the restaurant's mostly vacant second floor, kicked W.M.'s shin seven or eight times, and swore at her. He dragged W.M. downstairs and hit her nose with his head.

¶ 10 On the restaurant's main floor, defendant gave "two wads of money" to the restaurant owner. The owner's husband then "took [W.M.] away from" defendant. W.M. ran to her vehicle and tried to open the vehicle door, but defendant grabbed her from behind. W.M. was eventually able to get free. A waiter from the restaurant drove W.M. to meet with Abdelnabi at another restaurant. Abdelnabi helped W.M. get home, and W.M. later received treatment at a hospital. She described that her legs and nose were injured, and there "were marks *** like a hole."

¶ 11 On the evening of February 25, 2015, W.M. lived in a second-floor apartment unit in Bridgeview on the 7200 block of 84th Street. She was at home with Sara and her three children. Before 10 p.m., Sara left to meet with a friend, but W.M. thought he would only be gone for about 30 minutes. She watched a movie on her couch while her son slept on the couch and her two other children slept in their bedrooms.

¶ 12 At 10 p.m., defendant entered the apartment and sat next to her. W.M. testified that she had not invited defendant to her apartment and did not want him there, and she described defendant as looking "scary" and "drunk." Defendant held W.M.'s hand, put a knife to her neck, and told her not to "say anything," "scream," or "do anything stupid." W.M. did not scream because she did not want her children to see what was happening. Defendant then said, "I'm here to kill you, to kill the kids, and to kill myself." W.M. responded, "Why? What's going on? What did I do?" Defendant then told W.M. to show him her room. Defendant took W.M.'s phone from the kitchen, and W.M. led defendant to her bedroom.

¶ 13 In the bedroom, defendant left the door slightly ajar and told W.M. to undress. W.M. only removed her pants, and defendant made her put her mouth on his penis. Defendant then made W.M. lie on the bed, licked her vagina, and put his penis inside her vagina. W.M. testified that she did not want to do any of these sexual activities. Eventually, defendant stopped and stated,

"Tomorrow you will bring your belongings, yourself, and the kids. We're going back to Florida." Attempting to make defendant leave, W.M. told him, "Yes, go ahead, and tomorrow morning we will go ahead and meet." She testified that she was "trying to calm him down" because he was "scary looking." Defendant left the apartment.

¶ 14    W.M. immediately cleaned her mouth. After about two or three minutes, she attempted to call Abdelnabi, who did not answer. She then called a friend named Gadeja Yusuf, who asked W.M. why she was crying. W.M. stated, "Abe, he came to the apartment and he—he raped me, and *** he had a knife and he was going to kill me." Yusuf asked where Sara was, and W.M. stated that he was not answering his phone. Yusuf told W.M. to call the police, but W.M. responded that she was too scared. W.M. testified that she was afraid to call the police because she was "living with Arabian neighbors" and was afraid that if her husband learned what defendant did to her he would leave her because it was "part of tradition." W.M. hung up and then received a call from Abdelnabi. While speaking with Abdelnabi, W.M. saw she had missed a call from defendant. She called defendant back because she was afraid he was still downstairs and "wanted to show him that everything was okay." Defendant asked W.M. if she had called the police, and W.M. denied it. W.M. then attempted to call Sara, Yusuf, and Abdelnabi and eventually managed to reach Yusuf. Yusuf insisted that W.M. call the police and told W.M. not to take a shower. W.M. also spoke with Sara about the incident, and Sara screamed and stated, "Go ahead and call the police. I'm about three minutes away."

¶ 15    W.M. called the police, and the police and Sara arrived at the apartment. An ambulance took W.M. to the hospital. At the hospital, "something" was taken from W.M.'s hand, and swabs were conducted on her mouth and vagina. They also took a hair sample, her underwear, and blood, and they cut her nails. W.M. could not remember if an anal swab was conducted. W.M. testified

regarding photographs that the State presented depicting her apartment, the couch defendant sat on, W.M.'s bedroom, the towel W.M. wiped her mouth with, and the knife that defendant held to her neck.

¶ 16    On cross-examination, the defense asked W.M. to confirm that defendant was "a pretty good father," and W.M. stated, "No. My kids are scared of him." W.M. confirmed that she did not file a charge against defendant after the 2014 incident at the Chicago restaurant because defendant had "disappeared" and gone back to Florida.

¶ 17    On February 25, 2015, W.M. stated that there was an entrance to her apartment at street level, but it was open and unlocked. She confirmed that the entrance to the building was locked on other occasions, but explained that the building would be open and closed at different times because children frequently used the front entrance. W.M. confirmed that if the door had been locked, someone would have had to ring a bell to reach her apartment unit. She also stated that upon entering her apartment building, there were stairs leading to her second-floor unit, and her unit door also had a lock. W.M. testified that she always locks her unit door, that no one knocked on her door on the night of the incident, and that she did not get up from her couch to open the door. She additionally denied that defendant had a key to her apartment. Rather, defendant was able to enter her apartment because her husband had left to see his friend quickly and did not lock the doors. She did not get up to lock the door when her husband left and stated her husband typically "never left without locking the door."

¶ 18    W.M. also stated that a man who was with defendant on the night of the incident told W.M.'s brother-in-law that the man and defendant sat in a vehicle outside W.M.'s apartment, and defendant entered less than 10 minutes after Sara left. The man who was with defendant also said they sat outside W.M.'s apartment and watched the building "to see who was coming and going"

because defendant "wanted to come to the house to do something." W.M. confirmed that one of her children was still sleeping on the couch when defendant arrived. She knew defendant was drunk because he smelled like alcohol and had red eyes. W.M. believed that defendant left her apartment shortly after 10:20 p.m.

¶ 19    As to her phone conversations after the incident, W.M. could not recall whether the first phone conversation she had after the incident was from an incoming call from defendant. She confirmed that she spoke with defendant on the phone for four minutes at about 10:22 p.m., but she denied defendant had warned her that Sara saw defendant's vehicle. Rather, W.M. testified that defendant called her and told her not to call the police. W.M. also stated that she called Abdelnabi, Yusuf, and Sara. She stated she attempted to call Sara about 8 to 10 times because he was not answering his phone. W.M. did not know whether she called the police 58 minutes after the incident.

¶ 20    On redirect examination, W.M. stated she remembered making calls to Abdelnabi, Yusuf, Sara, and the police, and she made many calls because people were not answering their phones.

¶ 21    The State also called Iman Abdelnabi, who testified that she was friends with W.M. and knew defendant. On the evening of May 31, 2014, she went to a restaurant in Chicago with W.M. and saw defendant enter and walk to the bar. Abdelnabi went outside because she "didn't want to be there anymore" and called her family to pick her up. While W.M. testified that W.M. had stayed inside the restaurant at this point, Abdelnabi testified that W.M. joined her outside. Abdelnabi asked if W.M. wanted to leave with her, and W.M. went inside to grab her purse and phone but did not come back. Then, defendant exited the restaurant and asked Abdelnabi to leave. Abdelnabi left and joined her family at another restaurant. Around 3 a.m., she left the restaurant and saw W.M. crying and barely able to speak or breathe. W.M. was in "a very bad shape," looked terrified

and sad, and had "a lot of bad bruises" on her leg. Abdelnabi began to help W.M. get home and eventually called a friend to take W.M. to the emergency room.

¶ 22    On February 25, 2015, at about 10:30 p.m., she saw she had missed several phone calls from W.M. She contacted W.M., who sounded "[v]ery terrified" and could "barely speak." Eventually, W.M. was able to tell Abdelnabi what happened.

¶ 23    Before Abdelnabi could testify as to what W.M. said, the defense objected based on hearsay. The State argued that the excited utterance exception applied. The defense responded that the excited utterance exception did not apply because W.M. had already spoken with defendant and Yusuf by the time she called Abdelnabi. The court held the excited utterance exception still applied because the phone calls had occurred "in rapid succession," so there was "an absence of time to fabricate," and they were "immediate outcries to people for help."

¶ 24    Abdelnabi then testified that W.M. told Abdelnabi that defendant raped her, and that defendant had a knife to her neck "the whole time." W.M. also told Abdelnabi that her "life is over," that she was going to kill herself, that she did not know what to do, and that defendant was waiting for her outside. Abdelnabi responded to W.M. that "[t]his is very serious in the USA and it's not a joke," and told her that she needed to "calm down" and "call the 911 immediately."

¶ 25    The State then called Yusuf, who testified that she was W.M.'s friend and next-door neighbor, and that Yusuf's son went to school with W.M.'s son. On February 25, 2015, at about 10:20 or 10:30 p.m., she received missed phone calls from W.M. and spoke with W.M. on the phone. W.M. was "yelling" and "screaming" and stated, "[defendant] *** raped me." Yusuf told W.M. she needed to call the police, and W.M. hung up. Within 10 minutes, W.M. called Yusuf back. Yusuf asked W.M. if she called the police, and W.M. stated, "What are the people going to say about me?" Yusuf testified that W.M. was concerned because "culturally they're going to look

at her [like] she's a wh\*\*\*." Yusuf responded, "Who cares what people say? Call the police." Yusuf also told W.M. not to take a shower because the hospital would conduct a sexual assault kit. Yusuf also stated that W.M. had told her defendant had a knife and "made [her] go down on him."

¶ 26    Burbank police officer Grace Zarebczan testified that on February 26, 2015, after midnight, she received a radio transmission and observed a black Mercedes matching the description of a vehicle wanted in a "domestic incident." Zarebczan conducted a traffic stop on the Mercedes about half a block west of W.M.'s home address. Defendant and another man exited the Mercedes and began walking away from the vehicle, and Zarebczan stopped them. Eventually, Bridgeview officers arrived at the scene, and Zarebczan handed the investigation over to them.

¶ 27    Bridgeview police officer Zepeda[1] testified that on February 26, 2015, at about 12:20 a.m., he was dispatched to the address of W.M.'s apartment to process a sexual assault case. He took photographs of the apartment unit and bedroom, and collected a blanket, towel, and three paper towels. He then was dispatched to process a black Mercedes and found a knife in the Mercedes's center console. The State presented the knife that Zepeda recovered, as well as a photograph of the knife that Zepeda took. On cross examination, Zepeda stated he could not recall whether the door to W.M.'s apartment building was locked, and he believed the door to the apartment unit was open when he arrived. He stated that the entrance to the building was a "public entryway," so it "should lock automatically."

¶ 28    Bridgeview police detective Robert Tomiczak testified that on the late night of February 25, 2015, or early morning of February 26, 2015, he was briefed on a ACSA and home invasion case and learned that defendant was in custody. Tomiczak and Detective Prince[2] went to the

---

[1] The first name of Officer Zepeda does not appear in the transcript of the trial proceedings.
[2] The first name of Detective Prince does not appear in the transcript of the trial proceedings.

hospital where W.M. was held. Tomiczak spoke with W.M., obtained a sealed sexual assault kit from a nurse named Jennifer Geary, and transported it to the police station. The State presented the kit at trial. Once at the police station, Tomiczak interviewed Abdelnabi and Yusuf. He then relocated to another police department and Mirandized and interviewed defendant in the presence of Detective Prince. Defendant stated that he had drank a bottle of Jagermeister and Red Bull. Tomiczak told defendant his ex-wife had brought a sexual assault charge against him, and defendant "laughed and stated he no longer wanted to answer questions and wanted to speak with his attorney."

¶ 29    Tomiczak spoke with W.M. again at the Bridgeview Police Department and presented her with a photograph of the knife, as well as a photograph of defendant for identification. The State presented both photographs, both of which had been signed by W.M.

¶ 30    Sara testified that on February 25, 2015, he lived with his wife W.M. on a second-floor apartment unit in Bridgeview. Sara described his relationship with defendant as "[h]ate," and stated, "He never liked me and I never liked him." Sara was aware that defendant had hit W.M. at a restaurant in the north side of Chicago once.

¶ 31    On the night of February 25, 2015, Sara was at home with his children watching television, received a call from a friend, and went to a Dunkin' Donuts about four or five blocks away. At the Dunkin' Donuts, he was with other people and did not have access to his phone. When he returned to his vehicle to drive home, he saw he had missed several calls from W.M. Sara called W.M., and W.M. stated that defendant had had gone to her house, but she "was crying and *** panicked" and could not explain anything further. When Sara arrived back home, W.M. was "scared, crying, panicking, *** almost [like] she [was] going to have a heart attack." W.M. told Sara that defendant had walked through the door with a knife in his hand, told W.M. he would kill her if she screamed

or made "any noise," took W.M. to her bedroom, and "did what he did." W.M. called the police, and Sara spoke with the 911 operators. Sara also called defendant because he was "mad" and "going crazy," and he told defendant, "If you are [a] man, tell me where you [are] at. I'll come to you right now." The police arrived at the apartment, and an ambulance took W.M. to the hospital. Defendant stated after that night, his relationship with W.M. was "[d]ifferent *** in the bedroom," W.M. was "always scared" and did not want to leave the house, and she always thought defendant was going to send someone to kill her. Defendant stated that he and W.M. are Muslim, and that being a rape victim is perceived as shameful.

¶ 32    On cross-examination, Sara stated he hated defendant because defendant gave "so much problem to my wife [*sic*], even to me," and defendant used to "scratch [his] cars" and do "little kid*** stuff." He also confirmed that he once "battered" defendant's vehicle with a baseball bat because defendant "beat up" W.M. and was not "man enough to stand up in front of me." Sara was ordered to pay defendant for the vehicular damage. Sara denied that defendant gave W.M. money every week, and he denied that W.M. drove a vehicle owned by defendant. Additionally, he denied that W.M. ever left home to go to Florida with defendant for 10 to 14 days while Sara and W.M. were married.

¶ 33    Sara stated that when he left the apartment on the night of the February 25 incident, he was not planning to be gone for a long time and was only going to "get a cup of coffee, see a friend, and come back." He confirmed that he closed the apartment door but was not sure if he locked it. Sara also stated that even if the door to the apartment building was locked, someone could still easily open the door with a card. Sara was at the Dunkin' Donuts for about one hour. When Sara returned to the apartment, the apartment building door was already open, and he pushed it and walked in. W.M. was taken to the hospital about 30 or 40 minutes after the police had arrived. Sara

testified that the police took "a lot of evidence, like fingerprints." He denied that W.M. had any cuts or bruises but stated W.M. was scared and panicked.

¶ 34     The State entered in evidence by stipulation if called to testify, Jennifer Geary would state that she assisted in W.M.'s treatment at the hospital. W.M. stated that "an assailant armed with a knife entered her home, grabbed her wrist, threatened her life while holding the knife to her neck and sexually assaulted her." W.M. reported that the assailant penetrated her vaginally and orally, and that the assailant put his mouth on her vagina. Geary and Dr. Adam Bonder collected a sexual assault kit from W.M., and Geary turned over the sealed kit to Tomiczak.

¶ 35     The State also entered by stipulation that if called to testify, Illinois state police forensics scientist Jamie Bartolotta would state that she received the sexual assault kit collected from W.M., confirmed that semen was identified on the vaginal swabs and anal swabs in the kit, and preserved the swabs for DNA analysis. The State also entered by stipulation that defendant submitted a buccal swab while in prison, and that a Cook County state's attorney investigator obtained the swabs and placed them in a sealed envelope. Additionally, the State entered by stipulation that if called to testify, Illinois state police forensic scientist Lyle Boiken would state he conducted a DNA analysis of the swabs from the sexual assault kit; compared the DNA profile with defendant's buccal swab; and found that the DNA profile on the vaginal and anal swabs matched the DNA profile of defendant. Boiken would state that he concluded to a reasonable degree of scientific certainty that the semen identified from the vaginal and anal swabs collected from W.M. originated from defendant.

¶ 36     The State also entered into stipulation that an exhibit was a true and accurate copy of W.M.'s phone call records, which this court has reviewed. The phone records show that on February 25, 2015, at 10:22 p.m., W.M. received an incoming call from a Tampa, Florida, phone

number, and the call lasted four minutes. The records also show that at 10:30 p.m., W.M. placed a call to that same Tampa number, and the call lasted three minutes. The records also reflect that W.M. either made or received over 20 calls to and from various Illinois phone numbers before 11:18 p.m. At 11:18 p.m., a "911" call was placed from W.M.'s phone. A high volume of other calls to and from Illinois phone numbers are reflected in the records from 11:43 p.m. to 12:32 a.m.

¶ 37

¶ 38    The State rested.

¶ 39    Defendant testified on his own behalf. He stated that he "live[s] between Chicago and Florida" and operated a clothing store in Chicago on 92nd Street. He saw Sara "sometime[s]" when Sara came to pick up W.M. and defendant's children, and he saw W.M. every day. Defendant testified that W.M. visited defendant's store "many time[s]," sometimes with the children and sometimes alone. He also stated that W.M. left the children with him at the store frequently, and that one particular child stayed with him a lot because the child "loved [him] too much." Defendant also stated that the children went to Florida with him over 15 times, and they stayed with him when W.M. went to Jordan for six months. Defendant denied that his children were afraid of him.

¶ 40    In the beginning of 2014, W.M. married Sara, and defendant stated he had "a lot of problem[s]" with Sara because Sara was "jealous." After the marriage, defendant stated he continued to give her money "[a]lways," and that sometimes W.M. would have as much as $10,000 or $20,000 of his money "in her house." He also claimed that W.M. had three of his vehicles.

¶ 41    On February 25, 2015, W.M. had left one of her children with defendant because the child was "too hyper" and "bother[ed] her." At night, defendant drove to W.M.'s apartment to drop off their child and pulled into the driveway. At that point, the child was sleeping, and W.M. opened the apartment building door. Defendant told W.M. to call Sara to carry their child inside, and W.M.

stated, "My husband is not here." Defendant carried the child into W.M.'s apartment and placed him in his bed. Defendant confirmed that he had drank Jagermeister that night.

¶ 42     At that point, there was no one on the couch or sleeping in the living room of the apartment. Defendant sat on the couch, and W.M. sat next to him. Defendant denied that he had a knife on his person, but confirmed that he had a knife in his vehicle, as well as mace, a screwdriver, and a drill. W.M. told defendant she wanted to leave Sara and return to defendant because Sara "didn't work" and "didn't [have] any money." Defendant responded that he was already seeing someone but stated he would "take care of [W.M.]" and give her whatever she needed because W.M. was "the only one my kids accept." W.M. began to cry, and defendant hugged her, said there was "no problem," and gave her $500.

¶ 43     Defendant then testified that W.M. kissed him and went "between [his] legs." Defendant removed his pants, and W.M. put her mouth on his penis. Then, remaining in the living room, defendant "laid [W.M.] down on the floor," defendant put his penis in W.M.'s vagina, and defendant reached an orgasm. W.M. kissed defendant and walked away to "clean*** herself."

¶ 44     Defendant then left, and as he drove away, he saw Sara driving towards the apartment. Defendant called W.M. and told her that Sara was coming and that Sara had seen him. Defendant then told W.M. that Sara was going to be "mad," and that if there were any problems she should call the police. Defendant drove south down Harlem and received another call from W.M. Defendant picked up the phone and "[r]ight away" his vehicle slid and hit "the concrete and the sidewalk." W.M. asked what happened, and defendant stayed on the phone with her while he exited his vehicle and told W.M. that "only the bumper" was damaged. W.M. then told defendant that Sara had screamed at her and left, and she told defendant to "drive safely." Defendant confirmed that the police arrested him later that evening. He denied that he ever forced himself on W.M. to

perform any sexual acts, and he confirmed that "[w]hat happened was consensual." He then asserted that he was the victim, because W.M. "trap[ped]" him.

¶ 45   Defendant's direct examination concluded with the following colloquy:

> "Q. You're a convicted felon, are you not?
>
> A. I'm convicted felony [*sic*]—
>
> Q. You have been convicted of a felony, correct?
>
> A. Yes, sir.
>
> Q. You were sent to prison on that, is that correct?
>
> A. Yes, sir.
>
> Q. You served your time on that, have you not?
>
> A. Yes, sir.
>
> Q. What you're testifying to here today, is this the truth?
>
> A. Hundred percent, sir."

¶ 46   On cross-examination, defendant confirmed that he had been convicted of "a couple felonies": (1) one from a case in North Carolina involving about 25 counts for financial card fraud, forgery, and theft; and (2) one from a case in Illinois for possessing "document-making implements and altering credit and debit cards." He also confirmed that his clothing store never opened but was a "work-in-progress," as he was "doing decoration." The State asked defendant whether W.M. ever tried to stop him from seeing his children, and defendant stated, "How [are] you going to stop the dad? I'm the one [who] pay[s] the rent. I'm the one [who] give[s] her [a] car. I'm the one [who] give[s] her everything." Defendant then told the State, "I save[d] her life, ma'am. You don't know anything." He then claimed that W.M. "always need[ed]" him, and she "flip[ped] from need me to hate me."

¶ 47    Defendant denied that on the night of February 25, 2015, he had been drinking with his business partner and stated his partner did not drink. He stated that he drank a half pint of Jagermeister, and that he had dropped off his child that night. Defendant stated he knew what Sara's vehicle looked like, but he did not know whether W.M. or Sara were home when he arrived until he saw W.M. in the door.

¶ 48    Defendant also testified that as he left W.M.'s apartment, he drove to interstate 294, bought some nuts at an Arabic store, and drove towards a Hyatt hotel near O'Hare. Sara then called defendant and asked what he was doing in his home. Defendant responded, "[W]hy you don't [*sic*] ask her? She's the one [who] invite[d] me in and she want[ed] to leave you because you are nasty." Defendant also told Sara that Sara did not have money, that "[e]ven the phone bill" was under defendant's name, and that bought W.M. clothes from expensive stores.

¶ 49    Defendant also confirmed that he remembered Tomiczak taking him to be processed and telling him he was charged with sexual assault. Defendant denied telling Tomiczak that he never engaged in sexual activity with W.M. The State asked defendant if he in fact "persisted and kept talking" after telling Tomiczak he did not want to talk, even though Tomiczak "wasn't talking to [defendant] about the case." Defendant stated that he "never talk[ed] to anyone," and that he only stated he needed his attorney, but Tomiczak did not give him an attorney. After further questioning, he acknowledged that he had continued to talk and asked why he was arrested, but denied that he said he never engaged in sexual activity with W.M. Defendant also denied telling Tomiczak that he did not want Sara raising his children, that "everyone was after [W.M.] because she's very attractive," and that he contacted the Department of Children and Family Services for "abuse of [his] children under the care of Mr. Sara." He denied telling Tomiczak, "[W]hen does this end,

when I kill this guy?" He also denied that he had an issue with Sara raising his children. Defendant denied that he wanted W.M. to leave Sara for defendant.

¶ 50 The defense also called Kristin Mooser, who testified that she lived in Orlando, Florida, and had known defendant for four years and also knew W.M. On two occasions, Mooser gave W.M. money from defendant in Illinois after "the incident." She went to Chicago with defendant several times and "each time he was dropping a different car off" with W.M. Mooser stated that defendant had a "great close relationship" with his children and "took care of them very well."

¶ 51 The defense rested.

¶ 52 The State recalled Tomiczak in rebuttal, who testified that on February 26, 2015, he spoke with defendant immediately after meeting defendant. Defendant requested an attorney. At about 9 p.m. that evening, Tomiczak and Detective Matuszak[3] processed defendant on the charges. Tomiczak advised defendant they were processing him for charges of home invasion and criminal sexual assault. Defendant then stated, "I did not have sex with her," and Tomiczak responded they were not there to interview him because he had already requested an attorney. However, defendant continued talking, "stating that he did not want anybody else raising his children," that "[h]e did not want Mr. Sara raising his children," "that they do have a father," and that "everybody was after his ex-wife, [W.M.], because she's attractive." He then stated he had "contacted DCFS on Mr. Sara" but no one did anything, and defendant concluded, "[W]hen does this end, when I kill him?"

¶ 53 On cross-examination, the defense referred to this discussion between Tomiczak and defendant, and the following colloquy occurred:

"Q. This was put in your report, is that correct?

_____

[3] The first name of Detective Matuszak does not appear in the transcript of the trial proceedings.

A. That's correct.

Q. Was that report tendered to the State before today?

A. As far as I'm aware of—

Q. I'm sorry?

A. As far as I'm aware of, they stated that they did not have a copy of it.

Q. State did not have a copy until today?

A. Right."

¶ 54    The circuit court merged defendant's two charges of home invasion and found defendant guilty of two counts of ACSA and one count of home invasion. The court recounted the testimony and evidence that it had observed, and found that W.M. "testified very credibly as to [the] events that happened on February 25th," and "detailed the abusive relationship that she had with the defendant." The court noted that W.M.'s testimony was "corroborated by the witnesses presented by the State, her immediate outcry to her friends who testified during the course of the trial," and also noted that other witnesses described her manners in a way that was "consistent with someone who was sexually assaulted and who had a knife placed to their neck." The court further noted that the police stopped defendant's vehicle in close vicinity to W.M.'s apartment, and the knife placed to W.M.'s neck was found in the vehicle. Additionally, the circuit court found that defendant "lacks credibility," and stated that defendant's prior convictions and "the manner in which he testified" called into question defendant's honesty and credibility.

¶ 55    The defense filed a motion for new trial, alleged *inter alia* that there was no evidence W.M.'s apartment doors were "forced open or broken into," that W.M.'s testimony was not credible, and that W.M. was only testifying "to protect herself from a husband who saw [defendant] leave their apartment."

¶ 56    The circuit court denied the motion for new trial. The court reiterated its findings of credibility, but added that the State had presented evidence that defendant entered W.M.'s apartment without permission, and that the State did not have to show forced entry.

¶ 57    At the sentencing hearing, the circuit court was presented with the presentence investigation report (PSI). The PSI stated that in 2011, defendant was arrested and processed in North Carolina with 25 different charges, which included financial card fraud, criminal receipt of goods, financial card theft, and financial card forgery. He received three years' unsupervised probation in 2012 as a result of the North Carolina proceedings. Defendant had also received seven different traffic violations, two of which included child restraint violations. Additionally, defendant had been sentenced to four years' imprisonment in Illinois for possession of document-making implements and for the alteration of credit and debit cards.

¶ 58    The PSI also reported that defendant was born in 1977 in Amman, Jordan, to a family of 10 children; that he had a " 'good' " relationship with his parents; and that none of his parents or siblings had a criminal background or substance abuse problem. He was a member of the Jordanian army from 1989 through 1991 and was honorably discharged. Defendant's father died in 2002, and defendant moved to the United States in 2004 while his mother remained in Jordan. Defendant completed his elementary, secondary, and college educations in Jordan and described himself as a "good student." He reported that he had been self-employed as a clothing store owner for two years when he was arrested, and that he had operated an "online sales business" from 2006 through 2014. Additionally, defendant reported that he was the owner of a restaurant from 2002 through 2006. He denied having "any current income, assets, monthly expenses or outstanding financial obligations," and he stated that he has never declared bankruptcy.

¶ 59 Also according to the PSI, defendant married W.M. in 2005 in Jordan but divorced in February 2013 due to W.M.'s "infidelity." Defendant had three children with W.M. and reported that he had a "good relationship" with them prior to his incarceration. He denied that he was currently in a romantic relationship. He further reported that he had lived in Hickory Hills, Illinois, for 13 years and plans to continue residing in Illinois upon his release. Defendant denied having any past or present gang affiliation and described his friends as "positive law-abiding citizen[s]."

¶ 60 The PSI additionally stated that defendant was diagnosed with depression and bipolar disorder 18 months ago, and that he was prescribed medication for his psychiatric condition. Although he testified at trial that he had been drinking on the night of the offense, defendant reported in the PSI that he has "never consumed an alcoholic beverage" and has "never used any illegal or illicit substances."

¶ 61 In aggravation, the State argued that defendant should receive a "significant period of imprisonment." The State observed that defendant was subject to a minimum of 16 years for each ACSA conviction due to a 10-year enhancement for use of a knife, that defendant was subject to a minimum of 6 years for his home invasion conviction, and that all three convictions should be served consecutively. Further, the State noted that defendant had received numerous charges for financial identity theft and forgery and was "given the benefit of three years probation" in 2012. Nonetheless, defendant was arrested again in 2013 with another felony and was sentenced to four years' imprisonment for possessing document-making implements and altering credit and debit cards. The State argued that this criminal history showed defendant "has no regard for authority or the laws that most citizens abide by." As to the statutory factors in aggravation, the State emphasized (1) the serious, physical harm defendant caused W.M.; (2) defendant's criminal history, as the State had described; and (3) the necessity to deter others and "convey that this will

not be tolerated in our society." The State claimed there was "no mitigation" for defendant, and defendant did not deserve "anything close" to a minimum sentence.

¶ 62    In mitigation, the defense argued that prior to this case, defendant had not been convicted of any "violent or forceful crime," but rather "credit card manipulation" and "duplication." Further, the defense asserted that testimony showed defendant was a "good father" who "cared for his children." The defense concluded that defendant deserves a minimum sentence because his sentences would be consecutively served, and "[w]e're talking about an extremely lengthy period of time."

¶ 63    Defendant stated in allocution that he had remained silent throughout the court proceedings because he thought it would "make the Judge like [him]," until he eventually "scream[ed]" and said, "I'm innocent, I need a speedy trial." He claimed the circuit court told him "just be patient." Defendant then stated that he was going to prove his innocence. He claimed that the first attorney he retained "never even put the motion," so he hired a new attorney "just to push to the trial."

¶ 64    Defendant then asserted that W.M. and Sara had lied in their testimony about "everything," and asserted a number of factual disputes with the evidence presented at trial. He argued that W.M. did not "just receive a phone call from me, she receive[d] a phone call from me for four minutes," and he questioned why the conversation lasted so long. He asked the court, "You think I can do rape [*sic*] this woman? She's 24/7 in my possession. How [can I] do that with her?" As to the incident that occurred at the Chicago restaurant, defendant argued that the invitation he extended to W.M. to eat at the restaurant showed "there is a good relationship," and that "[n]o regular human being can believe" W.M.'s account. Defendant also stated that the State led the witnesses, and he could see through the State's apparent scheme because he is "46 years old," has been in "110 countr[ies]," and is "smart enough to come up with a situation." Defendant concluded, "I know

which [crimes] I did in my life, and I know which [crimes] I [didn't] do in my life," and "[t]his [is] a crime I didn't do."

¶ 65    Defendant claimed the "worst thing" he did to W.M. and her husband and children was "take care of them," "pay the rent for them," and "give them a car and a car and a car." Defendant acknowledged that he "did one mistake" in North Carolina but stated he was "with somebody" who was "teaching" him. He also claimed that Abdelnabi and Yusuf hated him and testified against him because he "separate[d] them" from his sister, after his sister took Vicodin and smoked cannabis with Abdelnabi and Yusuf. Defendant stated he asked his attorney to "bring [Abdelnabi] back and [Yusuf] back because there's many question[s]," but "[w]e" were not ready for the "interview." He then asserted that he "respect[s]" his attorney, and that his attorney did "a good job with a little money." Then, defendant stated:

> "By the way, he enforced me to come to bench trial because I don't pay him the rest of his money, because I don't have another $3,000. I was choosing jury trial, yeah, and he say I cannot go jury trial for this amount $2,000 I give him. I say, I cannot now, I have no money.
>
> [Defendant's first trial counsel], he get 7,000, he *** never [filed] any motion. All the things, six, seven thousand, he don't do anything. This is the only 2000. I was supposed to get another money [*sic*] from my family. I cannot connect him, you know. Every time I connect him [*sic*], it would be [a] problem, no third way calling, cut too much, they don't understand, they don't know who to send money to. I trust 1, 2, 3, 4, and everybody take[s] my money and disappear[s]. I don't have 3,000 to give him. He say[s], I cannot, and that's why we waive the jury trial."

¶ 66    Defendant then continued to state that in his "first case," he moved to quash evidence, but the court "didn't like it." Defendant asked, "[H]ow [am] I going to go with a judge if you didn't like my motion to quash evidence?" He then claimed that "[t]hey" went through his vehicle and destroyed everything in it, including $14,000, with the exception of the knife that was entered into evidence. Defendant continued:

> "You [are] supposed to save this stuff and give it back. I give my girl power of attorney to go pick up. She give her a couple of things from a hundred things. That's why I choose jury trial, a chance to see I need freedom. I look to protect myself, and I choose again jury trial, but they [do not want] to go with me to jury trial because it is a lot of work, and I don't give him money enough [*sic*]."

¶ 67    Defendant then recounted scheduling W.M. to take a "lie test" and a drug test after finding "paper for marijuana" and two Vicodin pills in a vehicle that W.M. drove. He also claimed that W.M. once called him crying and saying someone broke into her apartment and stole money, and that W.M. lied about her age. Defendant concluded that "they" lie about everything.

¶ 68    The court proceeded to its sentencing decision, and stated that it had considered the evidence at trial, the "aggravating nature and the facts of the case," and defendant's criminal history. Turning to the factors in mitigation, the court found that several mitigating factors did not apply because defendant threatened serious physical harm, there was no evidence defendant acted under strong provocation, there was nothing justifying defendant's conduct, defendant's conduct was not induced or facilitated by another person, and defendant "has not led a law-abiding life." The court also stated it heard no evidence that defendant was unlikely to commit another crime and found "his past shows that he has continued his criminal behavior."

¶ 69    As to defendant's statements, the court noted that defendant provided for his children and stated "his imprisonment does entail an excessive hardship to his children and dependents." Nonetheless, the court stated that defendant was "willing to place blame on everyone else" but himself. The court stated, "The reason he is here has nothing to do with me, has nothing to do with the State's Attorneys, nothing to do with the defense attorneys, it has to do with the Defendant making the choice to commit crimes."

¶ 70    The circuit court imposed two consecutive prison sentences of 18 years each for defendant's ACSA convictions, and a third consecutive prison sentence of 8 years for home invasion. The 18-year prison sentences for ACSA each consisted of 8 years for the underlying offense and a 10-year enhancement due to defendant's use of a knife.

¶ 71    This appeal followed.

¶ 72    II. ANALYSIS

¶ 73    A. Sufficiency of the Evidence

¶ 74    On appeal, defendant first argues that the State failed to prove defendant guilty beyond a reasonable doubt, where there was no proof of forced injury, no evidence of bodily injuries suffered by W.M., and the phone records supported Nassar's explanation.

¶ 75    The United States and Illinois Constitutions (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2) guarantee the right to due process, which "safeguards an accused from conviction except upon proof beyond a reasonable doubt of every fact necessary to prove each element that constitutes the crime charged." *People v. Murray*, 2019 IL 123289, ¶ 28 (citing *Jackson v. Virginia*, 443 U.S. 307, 315-16 (1979)). When reviewing a challenge to the sufficiency of the evidence at trial, "a reviewing court, considering all of the evidence in the light most favorable to the prosecution, must determine whether any rational trier of fact could have found beyond a

reasonable doubt the essential elements of the crime." *People v. Brown*, 2013 IL 114196, ¶ 48 (citing *Jackson*, 443 U.S. at 318-19). "[I]t is the responsibility of the trier of fact to fairly *** resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." (Internal quotation marks omitted.) *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009). It is also the role of the trier of fact to determine "the credibility of witnesses and the weight to be given to their testimony." *People v. Jordan*, 218 Ill. 2d 255, 274 (2006). "In reviewing the evidence, this court will not retry the defendant, nor will we substitute our judgment for that of the trier of fact." *People v. McLaurin*, 2020 IL 124563, ¶ 22. "A reviewing court will not reverse a conviction unless the evidence is unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt." (Internal quotation marks omitted.) *People v. Jackson*, 232 Ill. 2d 246, 281 (2009).

¶ 76    Section 11-1.20(a)(1) of the Criminal Code of 2012 (Code) (720 ILCS 5/11-1.20(a)(1) (West 2014)) provides that "[a] person commits criminal sexual assault if that person commits an act of sexual penetration" and "uses force or threat of force."  A person commits ACSA if that person commits criminal sexual assault and "displays, threatens to use, or uses a dangerous weapon, other than a firearm, or any other object fashioned or used in a manner that leads the victim, under the circumstances, reasonably to believe that the object is a dangerous weapon." *Id.* § 11-1.30(a)(1) (West 2014). Further, a person commits home invasion when:

> "without authority he or she knowingly enters the dwelling place of another when he or she knows or has reason to know that one or more persons is present or he or she knowingly enters the dwelling place of another and remains in the dwelling place until he or she knows or has reason to know that one or more persons is present *** and

(1) While armed with a dangerous weapon, other than a firearm, uses force or threatens the imminent use of force upon any person or persons within the dwelling place whether or not injury occurs ***." *Id.* § 19-6(a)(1) (West 2014).

¶ 77 The State presented evidence at trial that on February 25, 2015, at about 10 p.m., W.M. was in her apartment while her husband was gone and her children were asleep. Defendant entered the apartment, held a knife to her throat, and told her he would kill W.M., the children, and himself. Defendant then told W.M. to show him her room and once inside the room, told W.M. to undress. W.M. removed her pants, and defendant put his penis in W.M.'s mouth. Defendant further made W.M. lie on the bed, put his mouth on her vagina, and placed his penis inside her vagina. Defendant then left the apartment.

¶ 78 W.M. testified that she did not consent to any of the actions, and she called her friends Abdelnabi and Yusuf, and her husband Sara to tell them about the incident. She also spoke with defendant, who asked W.M. if she had called the police, which W.M. denied. W.M. eventually called the police, though she was initially scared to, and was taken to the hospital. At the hospital, a sexual assault kit was conducted, and the State presented stipulated evidence showing that defendant's semen was found on vaginal and anal swabs collected from W.M.'s sexual assault kit. The State also submitted evidence that a knife was found in defendant's vehicle when he was arrested.

¶ 79 In addition to W.M.'s testimony regarding the night of the incident, the State also presented evidence showing that defendant had a history of acting abusively towards W.M. See 725 ILCS 5/115-7.4 (West 2014) ("In a criminal prosecution in which the defendant is accused of an offense of domestic violence as defined in paragraph (1) and (3) of Section 103 of the Illinois Domestic Violence Act of 1986, *** evidence of the defendant's commission of another offense or offenses

of domestic violence is admissible, and may be considered for its bearing on any matter to which it is relevant.").[4] The State also presented testimony regarding W.M.'s phone conversations with her friends and husband, in which W.M. showed signs of extreme emotional distress and described the sexual assault immediately following her encounter with defendant. Ill. R. Evid. 803(2), (3) (eff. Apr. 26, 2012) (excluding from the hearsay rule excited utterances and statements "of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health)," even where the declarant is available as a witness). Even further, the evidence at trial showed that defendant in fact had a knife in his vehicle when he was pulled over after the incident.

¶ 80    Defendant testified that he was simply dropping off one of W.M.'s children, and had carried the child into W.M.'s apartment. He sat with W.M. on a couch in the apartment. Then, according to defendant, W.M. stated she wanted to leave Sara, kissed defendant, and initiated sexual contact with defendant. The two had vaginal intercourse, which defendant testified was consensual, and then defendant left W.M.'s apartment.

¶ 81    On appeal, defendant asserts that this case essentially came down to the credibility of two opposing witness accounts. He claims there was no corroborating physical evidence that he entered W.M.'s apartment without permission, or that the sexual activities between defendant and W.M. on February 25, 2015, were not consensual.

¶ 82    Nonetheless, even had W.M.'s testimony been the only evidence showing that defendant entered her apartment without permission and engaged in nonconsensual sexual acts with W.M.,

---

[4] We also note that sections 103(1) and (3) of the Illinois Domestic Violence Act of 1986 define "domestic violence" and "abuse" as "physical abuse, harassment, intimidation of a dependent, interference with personal liberty or willful deprivation." 750 ILCS 60/103(1) (3) (West 2014). Further, section 103(6) of the Domestic Violence Act includes former spouses and persons related "by present or prior marriage" under its definition of " '[f]amily or household members.' "

"the testimony of a single witness, if positive and credible, is sufficient to convict, even though it is contradicted by the defendant." *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009). It was the circuit court's role to determine the credibility of witnesses, and the circuit court expressly made a finding that W.M. was credible, and that defendant's account of the events lacked credibility. *Jordan*, 218 Ill. 2d at 274; *People v. Barbour*, 106 Ill. App. 3d 993 (1982) ("The issue of consent (or lack thereof) is ultimately a matter of credibility, a question best left to the trier of fact who heard the evidence and saw the demeanor of the witnesses."). We cannot substitute our judgment for that of the circuit court, as defendant asks that we do. *McLaurin*, 2020 IL 124563, ¶ 22.

¶ 83     We also strongly reject defendant's suggestion that W.M.'s lack of physical injuries should raise a reasonable doubt as to whether defendant's sexual contact with W.M. was nonconsensual. Illinois courts have consistently rejected arguments of this sort. See *People v. Bowen*, 241 Ill. App. 3d 608, 620 (1993) (stating "the lack of medical evidence of physical injury does not establish the victim consented to have sexual intercourse," "[p]hysical injury or resistance is not necessary to prove a victim was forced to have sexual intercourse," and "a victim need not subject herself to serious bodily harm by resisting in order to establish penetration was nonconsensual"); see also *People v. Shum*, 117 Ill. 2d 317, 356 (1987) (stating the lack of medical evidence did not raise a reasonable doubt as to the defendant's guilt because "medical evidence is not required to prove rape"). Moreover, W.M. specifically testified that she had complied with defendant's demands because she was scared—defendant was holding a knife to her throat and threatening to kill her and her children. It is only consistent that W.M. would not have sustained any noticeable injuries, as her testimony shows she did not physically struggle out of fear.

¶ 84     We also reject defendant's argument that the lack of evidence of forced entry into W.M.'s apartment should raise a reasonable doubt as to his guilt of home invasion. The statutory definition

of home invasion only requires that defendant entered a dwelling place without authorization. 720 ILCS 5/19-6(a)(1) (West 2014). Although there was no evidence of forcible entry into W.M.'s apartment, the State presented testimony that W.M.'s husband, Sara, had left the apartment in a hurry and forgotten to lock the apartment doors. Therefore, the lack of evidence that defendant used force to enter W.M.'s apartment did not defeat the State's case, as it was consistent with the State's theory that defendant was able to enter W.M.'s apartment through unlocked doors.

¶ 85     As to his contention that the phone records entered into evidence support defendant's version of the incident, and not W.M.'s account, we also find no ground to reverse the circuit court's convictions. W.M. testified that she could recall trying to contact her friends and husband several times before reaching each of them, and she recalled having a phone conversation with defendant at one point, in which defendant told her not to call the police. W.M. was unable to clearly testify as to the order in which she made the calls, or the manner in which she came into contact with defendant by phone following the incident. This is understandable, as her testimony and the phone records both suggest that W.M. was in a panicked state and frantically made dozens of calls in a short period of time. Given these circumstances, the circuit court was not required to find W.M. lacked credibility simply because she could not recall the exact order and duration of the many phone calls she made that night. Given the evidence of W.M.'s distressed mental state and the traumatic experience she had just endured, we cannot find that any trivial contradictions between her testimony and her phone records should raise a reasonable doubt as to defendant's guilt.

¶ 86     We also do not find it relevant that W.M. was reluctant to call the police and did not do so until after making several other calls. See *People v. Denis*, 2018 IL App (1st) 151892, ¶ 46 (refusing "to allow an hourglass to determine whether [the victim's] outcry was reasonable," and

acknowledging that "[v]ictims of sexual abuse are often threatened by their abusers not to disclose the improper sexual conduct").

¶ 87    For the foregoing reasons, we find that the circuit court properly found the State had proven defendant guilty beyond a reasonable doubt of ACSA and home invasion.

¶ 88    B. Prior Consistent Statements

¶ 89    Defendant next argues that W.M.'s credibility was improperly bolstered at trial by multiple prior consistent statements made to Abdelnabi, Yusuf, Sara, and the nurse, Jennifer Geary. The State responds that the circuit court properly considered the statements made to Abdelnabi, Yusuf, and Sara under the excited utterance exception, and that W.M.'s stipulated statement to the nurse in particular was admissible as a statement made for medical treatment.

¶ 90    Defendant acknowledges that his trial counsel objected to some of the "prior consistent statements" in question, but "only on hearsay grounds." Defendant nonetheless thus requests that we review this issue under the plain error doctrine or under a theory of ineffective assistance. We first turn to whether it was plain error for these statements to be admitted into evidence.

¶ 91    The plain-error doctrine "allows a reviewing court to reach a forfeited error affecting substantial rights" under certain circumstances. *People v. Herron*, 215 Ill. 2d 167, 178 (2005). The doctrine applies when either:

> "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People v. Clark*, 2016 IL 118845, ¶ 42.

When addressing a plain error claim, it is appropriate to first "determine whether error occurred at all," which "requires a substantive look at the issue." (Internal quotation marks omitted.) *People v. Naylor*, 229 Ill. 2d 584, 593 (2008).

¶ 92    It is true that generally, "prior consistent statements of a witness are inadmissible for the purpose of corroborating the trial testimony of the witness, because they serve to unfairly enhance the credibility of the witness." *People v. Johnson*, 2012 IL App (1st) 091730, ¶ 60. Nonetheless, we find that no error occurred in the admission of W.M.'s "prior consistent statements," as the statements were otherwise admissible under evidence rules.

¶ 93    The confrontation clause of the sixth amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him." U.S. Const., amend. VI. In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court reinterpreted the confrontation clause, holding that "the testimonial hearsay statements of a witness who is unavailable at trial may not be admitted against a criminal defendant unless the defendant had a prior opportunity for cross-examination." *People v. Patterson*, 217 Ill. 2d 407, 423 (2005) (citing *Crawford*, 541 U.S. at 68). "The hearsay rule generally prohibits the introduction of an out-of-court statement offered to prove the truth of the matter asserted therein." *People v. Williams*, 238 Ill. 2d 125, 143 (2010).

¶ 94    Illinois Rule of Evidence 803(2) (eff. Apr. 26, 2012) excludes from the hearsay rule "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event of condition." For the excited utterance exception to apply, " '(1) there must be an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) there must be an absence of time for the declarant to fabricate the statement; and (3) the statement must relate to the circumstances of the occurrence.' " *People v. Denis*, 2018 IL App

(1st) 151892, ¶ 73 (quoting *People v. Williams*, 193 Ill. 2d 306, 352 (2000)). "The trial court has discretion to determine whether statements are hearsay and, if so, whether admissible under an exception," and we will only reverse a trial court's hearsay ruling for an abuse of discretion. *People v. Dobbey*, 2011 IL App (1st) 091518, ¶ 43.

¶ 95     Defendant does not appear to dispute that W.M.'s statements to Abdelnabi, Yusuf, and Sara were excited utterances, and the testimony at trial supported the circuit court's finding that the statements clearly fell within the exception. Being sexually assaulted at knife point is absolutely startling enough to produce a "spontaneous and unreflecting statement." Ill. R. Evid. 803(2) (eff. Apr. 26, 2012). The testimony showed that within minutes of defendant's departure, W.M. began frantically calling Abdelnabi, Yusuf, and Sara until she was able to reach each of them—there was no indication that W.M. had time to calm down and fabricate a story. Moreover, her statements to her friends and husband related specifically to the occurrence, as she related that she was sexually assaulted by defendant at knifepoint.

¶ 96     Defendant also does not appear to dispute that W.M.'s statements to the nurse, Geary, were admissible under section 115-13 of the Illinois Code of Criminal Procedure of 1963 (725 ILCS 5/115-13 (West 2014)), which provides that "statements made by the victim to medical personnel for purposes of medical diagnosis or treatment including descriptions of the cause of symptom, pain or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment shall be admitted as an exception to the hearsay rule." W.M.'s description of the sexual assault to Geary was presented in the context of describing the treatment that W.M. received at the hospital, which included a sexual assault kit being collected. Thus, section 115-13 clearly applied to the statement made to the nurse.

¶ 97     Defendant essentially asserts that despite the fact that W.M.'s prior statements describing her sexual assault properly fell within clear exceptions to the hearsay rule, we must nonetheless find that the circuit court considered the statements for improper purposes. However, where a defendant has received a bench trial, this court must presume that the circuit court "consider[ed] only competent evidence in making a finding," unless the record affirmatively demonstrates otherwise. *People v. Simac*, 161 Ill. 2d 297, 311 (1994). In issuing its findings, the circuit court expressly stated that it had considered W.M.'s statements to other witnesses as evidence of her mental state, as it observed she acted in a manner "consistent with someone who was sexually assaulted and who had a knife placed to their neck." There is no point in the record that would suggest the court specifically considered the consistency of W.M.'s prior statements as evidence that she was more credible or telling the truth. Thus, we must presume the court considered these statements for proper purposes. *Id.*

¶ 98     Moreover, as the State notes, Illinois courts have previously held that "[a] prior consistent statement that meets the requirements for admission as an excited utterance *** is admissible as an exception to the hearsay rule." *People v. Watt*, 2013 IL App (2d) 120183, ¶ 43. Defendant argues that this case law is inapplicable, as it predates the most recent amended form of Illinois Rule of Evidence 613(c) (eff. Sept. 17, 2019), which added the following emphasized text: "*Except for a hearsay statement otherwise admissible under evidence rules, a* prior statement that is consistent with the declarant-witness's testimony is admissible for rehabilitation purposes only and not substantively as a hearsay exception or exclusion, [under certain circumstances]." However, this added language cuts against defendant's argument, as it clearly conveys that prior consistent statements may be admissible for other purposes where a hearsay exception applies. Here, the statements made to Abdelnabi, Yusuf, and Sara clearly fell under the excited utterance

exception. Ill. R. Evid. 803(2) (eff. Apr. 26, 2012). The statement made to the nurse at the hospital also fell under the exception made for the purpose of receiving medical treatment. We therefore conclude that the circuit court properly admitted the testimony regarding W.M.'s statements to Abdelnabi, Yusuf, Sara, and Geary.

¶ 99      C. Failure to Object to Improper Impeachment Regarding Defendant's Criminal

Background

¶ 100   Defendant also argues that his counsel was ineffective for failing to object to his improper impeachment based on his criminal background, namely, the convictions that defendant received in North Carolina involving financial card fraud, forgery, and theft. The State responds that (1) the defense opened the door to cross-examination regarding defendant's criminal background by attempting to minimize defendant's prior convictions, and (2) cross-examination regarding defendant's past crimes were admissible because the crimes involved dishonesty or false statements.

¶ 101   A criminal defendant has the constitutional right to the effective assistance of counsel under the sixth amendment to the United States Constitution (U.S. Const., amends. VI, XIV) and the Illinois Constitution (Ill. Const. 1970, art. I, § 8). *People v. Domagala*, 2013 IL 113688, ¶ 36. To succeed on an ineffective assistance of counsel claim, a defendant must establish that "counsel's performance was deficient," and that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). More specifically, "a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Domagala*, 2013 IL 113688, ¶ 36 (quoting *Strickland*, 466 U.S. at 694).

¶ 102   We find that defendant's trial counsel's performance was not objectively unreasonable, as the prior-crimes evidence at issue was admissible. *People v. Edwards*, 195 Ill. 2d 142, 165 (2001) ("Counsel cannot be considered ineffective for failing to make or pursue what would have been a meritless objection.").

¶ 103   Specifically, Illinois Rule of Evidence 609(a) (eff. Jan. 6, 2015) provides:

> "For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime, except on a plea of nolo contendere, is admissibly only if the crime, (1) was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, or (2) involved dishonesty or false statement regardless of the punishment unless (3), in either case, the court determines that the probative value of the evidence of the crime is substantially outweighed by the danger of unfair prejudice."

¶ 104   When conducting the balancing test described in subsection (3), the circuit court should consider "such factors as the nature of the previous conviction, how much time has elapsed since that conviction, the life the defendant has lived since the conviction, the defendant's criminal record, and the similarity between the prior conviction and the charged offense." *People v. Carr-McKnight*, 2020 IL App (1st) 163245, ¶ 79. Whether the probative value of prior-offense evidence is outweighed by its prejudicial effect is a matter left to the sound discretion of the circuit court. *People v. Illgen*, 145 Ill. 2d 353, 375 (1991).

¶ 105   During defendant's direct examination, defendant's trial counsel asked defendant to confirm that he was "convicted of a felony," and that he had "served [his] time." Defendant's counsel then asked defendant if he nonetheless was telling the truth in his testimony, and defendant stated, "Hundred percent, sir." On cross-examination, the State then pressed defendant to clarify

that he had in fact received two felony convictions: one in North Carolina for financial card fraud, forgery and theft; and one in Illinois for possessing "document-making implements and altering credit and debit cards." The convictions were admissible for the purposes of attacking defendant's credibility under Illinois Rule of Evidence 609(a) (eff. Jan. 6, 2015), as they concerned "dishonesty or false statement." We also cannot conclude that the evidence would have been more prejudicial than probative, when they had occurred within a small number of years of the offense in this case and showed a pattern of dishonesty leading up to the ACSA case that had not changed.

¶ 106    Moreover, even had this cross-examination elicited inadmissible testimony, the testimony was nonetheless elicited immediately after defendant had testified in direct examination that he had only received one conviction. "There is no question that a defendant can open the door to the admission of evidence that, under ordinary circumstances, would be inadmissible." *People v. Harris*, 231 Ill. 2d 582, 588 (2008). "In cases where a defendant testifies on direct examination as to some prior convictions but denies the existence of others or fails to testify to all convictions, the State may question a defendant on cross-examination as to the convictions to which a defendant did not testify." *People v. Groel*, 2012 IL App (3d) 090595, ¶ 49. After defendant had downplayed his criminal record in direct examination, the State was permitted to question defendant further to elicit more accurate testimony about his criminal background.

¶ 107    We therefore find that defendant's trial counsel was not ineffective for objecting to cross-examination regarding defendant's prior convictions, as the cross-examination was proper. We will address defendant's contention that the State failed to tender certificates of his North Carolina convictions later, along with his other contention regarding the State's failure to tender evidence.

¶ 108    D. Circuit Court's Failure to Inquire into Defendant's Ineffective Assistance Claim

¶ 109    Defendant also argues that the circuit court failed to inquire further into defendant's claim that his trial counsel coerced him into waiving a jury trial. The State responds that defendant did not have a right to a *Krankel* hearing because he had retained private counsel, and cites *People v. Pecoraro*, 144 Ill. 2d 1 (1991), to support the assertion that only defendants with appointed public defenders have the right to receive a *Krankel* hearing. The State also argues that the circuit court did not err, when defendant did not voice a complaint with his attorney's performance, but rather stated his attorney did a "good job" and only voiced a grievance that he was unable to pay his attorney the agreed-upon amount to conduct a jury trial.

¶ 110    In *People v. Krankel*, 102 Ill. 2d 181, 189 (1984), the Illinois Supreme Court held that where a defendant brought a posttrial motion alleging ineffective assistance of his trial counsel, the defendant should be represented by newly appointed counsel in a hearing to determine the merits of the ineffective assistance claim. The common law procedure set forth in *Krankel* and its progeny "is intended to promote consideration of *pro se* ineffective assistance claims in the trial court and to limit issues on appeal." *People v. Patrick*, 2011 IL 111666, ¶ 41.

¶ 111    "New counsel is not automatically required in every case in which a defendant presents a *pro se* posttrial motion alleging ineffective assistance of counsel." *People v. Moore*, 207 Ill. 2d 68, 77 (2003). Rather, once a defendant presents a *pro se* posttrial claim of ineffective assistance, the circuit court must examine the factual basis of the defendant's claim. *Id.* at 77-78. If the circuit court finds the ineffective assistance claim "lacks merit" or only concerns "matters of trial strategy," the court "need not appoint new counsel and may deny the *pro se* motion." *Id.* at 78. If the claims shows possible neglect, however, new counsel must be appointed and would then represent the defendant at a hearing on the ineffective assistance claim. *Id.*

¶ 112   In order to initiate the proceedings developed in *Krankel*, a *pro se* defendant is not required to file a written motion, but must only bring the ineffective assistance claim to the circuit court's attention. *People v. Roddis*, 2020 IL 124352, ¶ 35. Nonetheless, the defendant "must clearly raise that claim with the court." *People v. Bates*, 2019 IL 124143, ¶ 15.

¶ 113   *People v. Taylor*, 237 Ill. 2d 68 (2010), is instructive. In *Taylor*, the defendant's trial counsel had rejected a plea bargain and proceeded to trial. *Id.* at 70-71. He was convicted of possession of a controlled substance with intent to deliver, filed a posttrial motion that was denied, and proceeded to a sentencing hearing. *Id.* at 72. At the conclusion of the sentencing hearing, the defendant stated in allocution that he "had no idea what [he] was facing," and that he would have "jumped into" the plea bargain had he known he "was facing this type of situation." *Id.* at 73.

¶ 114   The supreme court in *Taylor* found that the defendant had not clearly set forth an ineffective assistance claim, as he did not "specifically complain about his attorney's performance, or expressly state he was claiming ineffective assistance of counsel." *Id.* at 76-77. The court further described the defendant's allocution statement as "rambling" and "amenable to more than one interpretation." *Id.* at 77. According to the supreme court, "[i]f defendant's statement in the case at bar were deemed sufficient to require a *Krankel* inquiry, few statements would be insufficient." *Id.*

¶ 115   Just as in *Taylor*, defendant here never raised an ineffective assistance claim alongside his posttrial motion, and his apparent ineffective assistance claim was mentioned in passing during defendant's rambling statement in allocution. Defendant never expressly stated he was alleging an ineffective assistance claim against his trial counsel. Rather, he commended his attorney as doing a "good job" and stated he signed the jury waiver because he could not afford the fee his attorney had charged for a jury trial. This statement, much like the statement in *Taylor*, was "amenable to

more than one interpretation," as the court could have interpreted the statement as defendant simply complaining that he could not afford the private attorney that he had retained. *Id.* at 77. We therefore find that defendant's statement at sentencing did not sufficiently set forth an ineffective assistance claim that required a *Krankel* inquiry.

¶ 116 Even if the statement was sufficient, however, the record shows that the circuit court considered defendant's statement in allocution as a whole and simply did not believe it. The court found that defendant was attempting to "place blame on everyone else" but himself. The circuit court was not required to conduct a *Krankel* hearing if it found that defendant's claim lacked merit, assuming defendant stated a claim at all. *Moore*, 207 Ill. 2d at 77-78. We therefore find that the circuit court did not err by failing to inquire further into defendant's statement regarding his jury waiver.

¶ 117   E. Excessive Sentence

¶ 118   Defendant additionally argues on appeal that his sentence was excessive because there was "insufficient aggravating evidence" and "sufficient mitigating evidence."

¶ 119   The proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Illinois Supreme Court Rule 615(b)(4) grants reviewing courts the power to reduce a sentence. However, this power must be exercised "cautiously and sparingly." *People v. Jones*, 168 Ill. 2d 367, 378 (1995).

¶ 120   The circuit court is afforded "broad discretionary powers in imposing a sentence, and its sentencing decision are entitled to great deference." *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). This is because the circuit court, "having observed the defendant and the proceedings, has a far better opportunity to consider these factors than the reviewing court, which must rely on the

'cold' record." *People v. Fern*, 189 Ill. 2d 48, 53 (1999). The circuit court's sentencing determination must be based on "the particular circumstances of each case, considering such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *Id.* The reviewing court may not "substitute its judgment for that of the trial court merely because it would have weighed these factors differently." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). "[W]hen a sentence falls within the statutory guidelines, it is presumed to be proper and will not be disturbed absent an affirmative showing that the sentence is at variance with the purpose and spirit of the law or is manifestly disproportionate to the nature of the offense." *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46. When the circuit court imposes a sentence within statutory limits, we will not reverse the sentencing decision absent an abuse of discretion. *People v. Vazquez*, 315 Ill. App. 3d 1131, 1134 (2000).

¶ 121   Defendant was sentenced based on two counts of ACSA and one count of home invasion. Class X felonies are subject to a sentencing range of 6 to 30 years' imprisonment. 730 ILCS 5/5-4.5-25 (West 2014). Section 11-1.30(d)(1) of the Code (720 ILCS 5/11-1.30(d)(1) (West 2014)) defines ACSA as a Class X felony and provides that 10 years shall be added to a sentence where the person commits ACSA while threatening to use a dangerous weapon. Home invasion is also classified as a Class X felony. 720 ILCS 5/19-6(c) (West 2014). Based on these statutory provisions, defendant was subject to a minimum of 16 years for each of his two ACSA convictions, and a minimum of 6 years for his home invasion conviction. Because defendant was convicted of ACSA, his sentences were also statutorily mandated to run consecutively. 730 ILCS 5/5-8-4(d)(2) (West 2014). Therefore, combining all of defendant's consecutive sentences, defendant was subject to a total sentencing range of 38 to 110 years' imprisonment.

¶ 122   Defendant received sentences of 18 years each for his ACSA convictions, and 8 years for his home invasion conviction, totaling 44 years. This sentence was not only within defendant's statutorily mandated sentencing range, it was also within the lower end of the sentencing range. The court only added two years to the minimum sentence for each of defendant's convictions. As such, we must presume defendant's sentence was proper. *Knox*, 2014 IL App (1st) 120349, ¶ 46.

¶ 123   At the sentencing hearing, the PSI reflected that defendant had previously been convicted of a felony in North Carolina, and had been convicted of a felony once again in Illinois. The circuit court stated it considered the nature of defendant's offense "aggravating," and noted that defendant had an extensive history of criminal activity. See 730 ILCS 5/5-5-3.2(a)(1), (3) (West 2014) (listing factors in aggravation that may be considered at a sentencing hearing, including that the defendant's conduct "caused or threatened serious harm" and that the defendant "has a history of prior delinquency or criminal activity").

¶ 124   The circuit court also found that many mitigating factors set forth in section 5-5-3.1 of the Code of Corrections (*Id.* § 5-5-3.1(a) (West 2014)) did not apply. Namely, subsections (1) through (5) of section 5-5-3.1(a) did not apply because defendant's conduct did cause or threaten serious physical harm to another, defendant clearly contemplated his conduct would do so, there was no evidence showing defendant acted under strong provocation, there was nothing excusing or justifying defendant's criminal conduct, and the conduct was not induced or facilitated by another person. *Id.* § 5-5-3.1(a)(1)-(4) (West 2014). Based on defendant's past criminal conduct and his general attitude, the court also found that subsection (9) did not apply, as there was nothing showing defendant was "unlikely to commit another crime." *Id.* § 5-5-3.1(a)(9) (West 2014). The court only acknowledged one fact that fell under the statutory mitigating factors: that defendant's imprisonment "would entail excessive hardship to his dependents." *Id.* § 5-5-3.1(a)(11) (West

2014). The court also noted that defendant had continued to engage in criminal behavior, and that in allocution defendant had continued to "place blame on everyone else" without taking responsibility for his offense. *People v. Ward*, 113 Ill. 2d 516, 528 (1986) (stating that "[i]n some instances and under certain factual circumstances, a continued protestation of innocence and a lack of remorse may convey a strong message to the trial judge that the defendant is an unmitigated liar and at continued war with society," and that such an impression is a proper factor to consider in imposing sentence).

¶ 125   Defendant essentially asks this court to reweigh all of the factors presented to the circuit court when imposing its sentence, which we cannot do. *Stacey*, 193 Ill. 2d at 209. Despite the brutal nature of the crime and the lack of mitigating factors applicable to defendant, the circuit court imposed a sentence on defendant that was close to the very lowest sentence defendant could have received. As such, we find that the circuit court did not abuse its discretion by imposing an excessive sentence.

¶ 126   F. Failure to Tender Evidence

¶ 127   Defendant also asserts that his trial counsel failed to object to two pieces of evidence that were never tendered prior to trial: (1) defendant claims the State never "tendered anything prior to trial regarding certification of Nassar's criminal activity in North Carolina"; and (2) defendant also claims that the State never tendered defendant's statements voluntarily made to Detective Tomiczak, in which defendant apparently denied that he had sexual intercourse with W.M. on the night of the offense.

¶ 128   As to this first item, there is nothing in the record indicating whether or not the "certification of Nassar's criminal activity in North Carolina" was tendered prior to trial. As to the second item, defendant relies solely on the cross-examination of Tomiczak, who was called to

testify in rebuttal as to defendant's statements. In that cross-examination, Tomiczak only stated that the State did not have a copy of the report containing the statements until that day. We note that there is nothing in the record further discussing or verifying this statement made by Tomiczak. Further, there is no indication in the record as to (1) whether defendant was aware of these statements made to Tomiczak, or the possibility that the statements would be raised later; (2) whether defendant had discussed these statements with his counsel prior to trial; or (3) whether defendant's trial counsel was unaware of the statements, as the cross-examination of Tomiczak did not go beyond the question of whether the State had a copy of Tomiczak's report prior to trial.

¶ 129    The Illinois Supreme Court has previously acknowledged that "ineffective assistance of counsel claims may sometimes be better suited to collateral proceedings but only when the record is incomplete or inadequate for resolving the claim." *People v. Veach*, 2017 IL 120649, ¶ 46. The supreme court reasoned that "in Illinois, defendants are required to raise ineffective assistance of counsel claims on direct review if apparent on the record." *Id.* Where the claim depends upon facts not found in the record, however, procedural default does not preclude a defendant from raising the claim on collateral review. *Id.* ¶ 47.

¶ 130    The record lacks the factual development necessary to support defendant's claim that his trial counsel failed to object to evidence that the State did not tender prior to trial. As such, this claim would be more appropriately raised on collateral review. Accordingly, we do not reach the merits of this issue and make no finding as to whether the claim would be successful.

¶ 131    III. CONCLUSION

¶ 132    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 133    Affirmed.